UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; and ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> MICHIGAN SPINE MANAGEMENT CLINIC PLC; DOWNRIVER SPINE MANAGEMENT CLINIC, P.L.L.C.; FIRST MUTUAL TRANSPORTATION LLC; MOHAMED RAYCHOUNI, D.C.; and MUSTAFA RAYCHOUNI, D.C., <br><br> Defendants. | C.A. No. _____ <br><br><br><br> **Demand for Jury Trial** |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.    INTRODUCTION

1.    This is a case about chiropractic clinics and a transportation provider that engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail and

1

interstate wires seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.     Defendants Michigan Spine Management Clinic PLC ("Michigan Spine"), Downriver Spine Management Clinic, P.L.L.C. ("Downriver"), First Mutual Transportation LLC ("First Mutual"), Mohamed Raychouni, D.C. ("Mohamed Raychouni"), and Mustafa Raychouni, D.C. ("Mustafa Raychouni") (collectively, the "defendants") each defrauded Allstate by perpetuating an insurance fraud scheme in violation of federal and state law.

3.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants totaling hundreds of thousands of dollars.

4.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

5.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

## II.    THE PARTIES

### A.    PLAINTIFFS

6.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each a company duly organized and existing under the laws of the State of Illinois.

7.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

8.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.    DEFENDANTS

#### 1.    Michigan Spine Management Clinic PLC

9.    Defendant Michigan Spine is a professional limited liability company organized under the laws of the State of Michigan.

10.    Michigan Spine's member is defendant Mohamed Raychouni, who is a resident of the State of Michigan.

11.    At all relevant times, Michigan Spine was operated and conducted by defendants First Mutual and Mohamed Raychouni.

12.    Michigan Spine billed Allstate for services not rendered, services that were medically unnecessary (to the extent they were rendered at all), and services that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

### 2.    Downriver Spine Management Clinic, P.L.L.C.

13.    Defendant Downriver is a professional limited liability company organized under the laws of the State of Michigan.

14.    Downriver's members are Mohamed Raychouni and Mustafa Raychouni, who are each residents of the State of Michigan.

15.    At all relevant times, Downriver was operated and conducted by defendants First Mutual, Mohamed Raychouni, and Mustafa Raychouni.

16.    Downriver billed Allstate for services not rendered, services that were medically unnecessary (to the extent they were rendered at all), and services that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 2.

### 3.    First Mutual Transportation LLC

17.    Defendant First Mutual is a limited liability company organized under the laws of the State of Michigan.

18.    First Mutual's member is Hussein Nasser, who is a resident of the State of Michigan.

19.   At all relevant times, First Mutual was operated and conducted by defendants Michigan Spine, Downriver, Mohamed Raychouni, and Mustafa Raychouni.

20.   First Mutual billed Allstate for services that were not rendered, that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 3.

### 4.   **Mohamed Raychouni, D.C.**

21.   Defendant Mohamed Raychouni is a resident and citizen of the State of Michigan.

22.   At all relevant times, Mohamed Raychouni owned defendants Michigan Spine and Downriver and operated and controlled defendants Michigan Spine, Downriver, and First Mutual.

### 5.   **Mustafa Raychouni, D.C.**

23.   Defendant Mustafa Raychouni is a resident and citizen of the State of Michigan.

24.   Since 2021, Mustafa Raychouni owned defendant Downriver and operated and controlled defendants Downriver and First Mutual.

III.    **JURISDICTION AND VENUE**

25.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*., because they arise under the laws of the United States.

26.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

27.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

28.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas a substantial part of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

IV.    **BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME**

29.    The perpetrators of the insurance fraud scheme described herein are two chiropractic clinics – defendants Michigan Spine and Downriver (collectively, the "Raychouni clinics") – and defendant First Mutual, a transportation company that billed for transporting the patients of the Raychouni clinics.

30.    Defendant Mohamed Raychouni is an owner of both Raychouni clinics who billed for chiropractic treatment and services though Michigan Spine and

employed his brother, Mustafa Raychouni, to bill for nearly identical services through Downriver.

31.     In or about 2021, Mohamed Raychouni conveyed some or all of the ownership of Downriver to Mustafa Raychouni.

32.     Although Michigan Spine and Downriver are separate legal entities, they both operate using the same fictitious name "MiSpine Chiropractic."

33.     The Raychouni clinics operate in a nearly identical manner, including by billing for nearly identical alleged services that barely vary from patient to patient, using the same boilerplate medical documents, and funneling patients to or receiving them from First Mutual.

34.     In order to exploit Michigan's No-Fault Act, the defendants targeted patients who claimed to have been involved in motor vehicle accidents.

35.     The defendants improperly induced patients to present to the Raychouni clinics by offering disability certificates, prescriptions for home replacement services, and free transportation from First Mutual, all of which lacked any medical basis.

36.     Once patients were acquired, the defendants billed insurance companies like Allstate for a host of predetermined treatments and for transportation services that were excessive, unnecessary, and often not provided at all.

37.    The treatments billed by the Raychouni clinics were virtually identical for every patient regardless of patients' ages, histories, accidents, needs, or purported injuries.

38.    The Raychouni clinics' predetermined treatments included chiropractic manipulative therapy ("CMT"), manual (i.e., trigger point) therapy, therapeutic exercises, mechanical traction, "shockwave therapy," and "cold laser" treatments.

39.    To induce Allstate to pay their bills, the Raychouni clinics falsified medical records to exaggerate patients' symptoms and diagnosed "subluxations" (alleged spinal misalignments) that did not exist.

40.    The Raychouni clinics also routinely billed for nearly an hour and a half of treatment to nearly every patient on nearly every date of service, but almost none of their patients spent that much time inside the clinics.

41.    For all the reasons set forth herein, the bills submitted by the defendants were never compensable and Allstate is entitled to a return of all monies it was induced to pay to the defendants and a ruling that it is not required to pay any further amounts in response to the defendants' fraudulent bills.

## V.    BILLING FOR SERVICES NOT RENDERED

42.    The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

43.    The defendants' pervasive conduct of mailing and faxing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

44.    All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for treatment that never occurred are fraudulent.

45.    Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## A.    BILLING FOR TIMED SERVICES NOT RENDERED

46.    The Raychouni clinics regularly billed for services not rendered by billing for far more treatment than they could have possibly provided in the time that patients spent inside the clinics.

### 1.    Falsified Time-Keeping

47.    Timed therapies that the Raychouni clinics routinely billed, such as therapeutic exercises, neuromuscular reeducation, and manual therapy, represent fifteen (15) minutes per unit billed of direct, one-on-one treatment by a properly qualified provider.

48.     Services billed in fifteen (15) minute increments require the performance of at least eight (8) minutes of treatment in order to submit a charge for one (1) unit.

49.     When multiple units of timed codes are billed on the same date, all units for all such codes must be aggregated and rounded to the nearest full unit to obtain the total number of billable units.

50.     For example, to bill four (4) units in one day, as the Raychouni clinics often did, requires at least 53 minutes of one-on-one, direct provider-to-patient therapy.

51.     Billing for timed services requires providers to accurately track time by the minute, and to bill for the appropriate number of units based on that time-keeping.

52.     By way of example, proper time-keeping would record that a treatment for therapeutic exercise started and ended at specific times such as 11:54 a.m. to 12:05 p.m., for a total of eleven (11) minutes and manual therapy began at 12:08 p.m. and ended at 12:30 p.m. for a total of twenty-two (22) minutes.  The total adds up to thirty-three (33) minutes, which would be rounded to two (2) billable units.

53.     The time recorded must only be for the time during which a licensed provider was providing direct, one-on-one, skilled therapy to the patient.

54.    The Raychouni clinics' time-keeping did not comply with these standards and it was falsified.

55.    Rather than accurately tracking and recording time, the Raychouni clinics used boilerplate, automatically generated forms to claim that they always provided exactly fifteen (15) minutes of treatment for each billed unit of any timed code.

56.    The only exception to these claims of precisely fifteen (15) minutes of treatment were when the Raychouni clinics billed for three (3) units of therapeutic exercises and claimed the time spent in a range such as "42-45 min" or "41-45 min."

57.    The Raychouni clinics could not have accurately tracked and recorded time if they cannot give the precise number of minutes spent providing the alleged therapeutic exercises, and providing a range of time that services could possibly have been performed is never appropriate.

58.    The Raychouni clinics also failed to accurately document who, if anyone, provided alleged treatments, which is significant because the total amount of timed treatments billed by the Raychouni clinics could not have actually been accomplished by their limited number of providers, as detailed further below.

59.    Michigan Spine's boilerplate submissions always claimed that Mohamed Raychouni was the sole "provider" or "treating doctor."

60.     Downriver's nearly identical submissions always claimed that either Mohamed Raychouni or Mustafa Raychouni was the sole "provider" or "treating doctor."

61.     Mustafa Raychouni has testified, however, that these representations were often false and that Mohamed Raychouni was often listed as the "treating doctor" on Downriver's submissions even when Mustafa Raychouni was, in fact, providing treatment (if any treatment was provided at all).

### 2.     The Raychouni Clinics Billed for More Treatment Than They Could Have Rendered

62.     The Raychouni clinics routinely billed for alleged services that would have taken well over an hour to provide per patient, and often would have taken more than an hour and a half.

63.     Patients of the Raychouni clinics did not spend nearly that much time inside the clinics.

64.     The alleged "treating doctors" also billed for treating far more patients than they could have treated during the time that the clinics were open each day.

65.     Since 2021, the Raychouni clinics nearly always billed for three (3) units of therapeutic exercise, or two (2) units of exercise and one (1) unit of neuromuscular reeducation, for each patient on each date, and claimed that they provided at least forty-one (41) minutes of treatment.

66.     Recently, and in an effort to generate additional charges not subject to the No-Fault Act's fee schedule as detailed further below, the Raychouni clinics have occasionally replaced one of these units with shockwave or cold laser therapy but represented that the time spent on such experimental and inappropriate treatments was the same.

67.     The Raychouni clinics also routinely billed for one (1) unit of manual therapy and mechanical traction, both of which were always purported to be rendered for exactly fifteen (15) minutes each.

68.     These routinely billed therapies for which the Raychouni clinics claimed specific amounts of time add up to at least 71 minutes of purported treatment per date of alleged treatment.

69.     The Raychouni clinics also always billed for CMT to at least three (3) spinal regions for each patient on each date.

70.     The Raychouni clinics billed a higher rate for CMT than for one (1) unit of any timed code, so it stands to reason that alleged CMT took at least a similar period of fifteen (15) minutes to perform.

71.     Accordingly, for nearly every patient and on nearly every date of service, the Raychouni clinics billed for nearly an hour and a half of treatment per patient, and sometimes more.

72.     Observation of Michigan Spine's entrances on ten (10) separate business days in January and May of 2024 identified at least 466 patients[1] visiting the clinic.

73.     These 466 patients spent an average of just thirty-six (36) minutes and 58 seconds inside the clinic.

74.     Even assuming that these patients spent no time waiting for treatment, using a restroom, filling out paperwork, transitioning between modalities, or resting between exercises, which is highly unlikely, the average amount of time each patient was present inside the clinic was still far less than the amount of time the Raychouni clinics routinely billed for treating each patient.

75.     Of those 466 patients, only forty-three (43) of them were inside the clinic for at least an hour.

76.     Of the 466 patients, only three (3) spent at least 90 minutes inside the clinic.

77.     Because patients' time inside the clinic overlapped with that of other patients, this clear evidence of billing for services not rendered is even more stark

---

[1] This count of patients excludes any visitor who remained inside the clinic for ten (10) minutes or less and any child accompanied by an adult based on the assumption that only the child or the adult was there to received alleged treatment, not both of them, and therefore any child/adult pair was only counted once.

when taking into account the maximum amount of time a single chiropractor could have spent providing treatment to each patient.

78.    As one specific example, on January 17, 2024, 63 patients visited Michigan Spine, and 490 minutes elapsed from the time the first entered to the time the last left, which equates to an average of seven (7) minutes and forty-six (46) seconds per patient for a single chiropractor if no breaks were taken during this period of just over eight (8) hours.

79.    Similarly, on May 20, 2024, Michigan Spine was visited by 78 patients over the course of 552 minutes, for an average of seven (7) minutes and four (4) seconds per patient for a single chiropractor (again assuming no breaks).

80.    Put another way, to properly bill for the average of 90 minutes of treatment routinely claimed by the Raychouni clinics to 78 patients in the span of 552 minutes would require at least thirteen (13) qualified providers.

81.    Michigan Spine clearly could not and did not actually render treatment to all of these patients.

82.    In addition to generally billing for far more treatment than could possibly have been rendered, the Raychouni clinics billed for specific treatment to Allstate insureds that was not actually provided.

83.    For example, Michigan Spine billed Allstate for 86-90 minutes of treatment (as expressly reported in its own record) to A.A. (Claim No.

15

0737752733)[2], plus an unspecified amount of time allegedly providing CMT to five (5) spinal regions, on January 15, 2024.

84. A.A. is a female and, on January 15, 2024, the longest any female spent inside Michigan Spine was 52 minutes.

85. Michigan Spine billed for identical alleged treatment, for an identical amount of alleged time, to A.A. on January 18, 2024.

86. On January 18, 2024, no female spent more than 61 minutes inside the clinic.

87. Michigan Spine also billed Allstate alleged treatment to S.T. (Claim No. 0742375769), another female, on January 15, 2024.

88. Michigan Spine billed S.T. for identical treatment for an identical amount of time as A.A. (86-90 min, plus CMT) with the only variation being the spinal levels allegedly adjusted.

89. As stated previously, the longest any female spent inside Michigan Spine on January 15, 2024 was 52 minutes. The second longest amount of time spent inside the clinic by any female on that date was 43 minutes.

---

[2] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number. As the defendants only submit bills to Allstate using the Allstate claim number, they are aware of these patients and can identify them by the information provided herein.

90.     Even assuming that A.A. and S.T. were the females who were in the clinic for the longest periods of time, Michigan Spine billed for treatment that it claimed took more than twice as long as one of these patients was in the clinic and nearly twice as long as the other.

91.     On May 24, 2024, Michigan Spine billed for at least 83 minutes of timed therapy, plus CMT to more than five (5) regions to T.M. (Claim No. 0752929208), who is female.

92.     The longest that any female spent inside Michigan Spine on May 24, 2024 was 71 minutes, which is not long enough for the treatment billed by Michigan Spine even if T.M. was the female that was in the clinic for that length of time.

93.     Of the thirty-four (34) female patients who entered Michigan Spine on May 24, 2024, the average amount of time spent in the clinic was just 33.8 minutes.

94.     In some cases, the Raychouni clinics' own representations demonstrate that they billed for therapies that they did not actually provide.

95.     For example, Downriver billed Allstate for extraspinal CMT to patient R.D. (Claim No. 0659027494) on August 11 and 15, 2022.

96.     On both of those dates, Mohamed Raychouni claimed that he provided only CMT to R.D.'s spine and not any extraspinal CMT.

97.     For the reasons set forth herein, it is not possible that the defendants actually performed the treatment billed to Allstate.

**B.**   **BILLING FOR TRANSPORTATION SERVICES NOT PROVIDED**

98.    The alleged transportation services billed by defendant First Mutual were always medically unnecessary because they were not prescribed based on patients' needs or disabilities, but rather solely to generate fees for First Mutual and to induce patients to present to the Raychouni clinics.

99.    In some instances for which it billed Allstate, First Mutual did not provide transportation at all.

100.    For example, First Mutual billed for allegedly transporting A.M. (Claim No. 0619770372) to all his appointments at Downriver starting on April 19, 2021, even though A.M. had not yet been evaluated by Downriver or prescribed medical transportation.

101.    The last day Downriver billed for treating A.M. was September 9, 2021, but First Mutual continued to bill for purportedly transporting A.M. to appointments at Downriver on ten (10) more dates from September 10, 2021 to September 30, 2021.

102.    A.M. was not actually transported to Downriver on these dates, and it appears that First Mutual was unaware that A.M. was no longer being treated at Downriver, which suggests that A.M. was not actually transported by First Mutual even on prior dates on which treatment was supposedly ongoing.

103.   Similarly, First Mutual billed for transporting patient L.S. (Claim No. 0657439832) to her alleged appointments at Michigan Spine, including her first date of service on February 17, 2022.

104.   The last day that Michigan Spine billed for treating L.S. was July 5, 2022.  First Mutual, however, continued to bill for  transporting L.S. for forty (40) more dates of service until October 31, 2022.

105.   Allstate is not required to pay for transportation services not provided.

## VI.   UNLAWFUL AND UNLICENSED PROVISION OF DURABLE MEDICAL EQUIPMENT

106.   In order to legally issue durable medical equipment ("DME") in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

107.   A license from the Michigan Board of Pharmacy is required for all "drugs and devices manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722.

108.   Th Raychouni clinics billed Allstate for purportedly dispensing and issuing DME to patients at issue herein, including TENS devices and back braces. *See* Exhibits 1 and 2.

109.   The Raychouni clinics have never possessed a license to issue DME in the State of Michigan at any time relevant to this action.

110.   Because the clinics did not possess a license to issue DME, their bills for purportedly doing so were unlawful and not compensable under the No-Fault Act.

111.   Allstate is not required to pay the Raychouni clinics for DME issued without a license and is entitled to restitution for payments it was induced to make by the false bills submitted by the Raychouni clinics, Mohamed Raychouni, and Mustafa Raychouni.

## VII.   FALSE SUBMISSIONS USED TO SUPPORT FRAUDULENT BILLS

112.   The defendants created and routinely mailed and faxed to Allstate false submissions in an effort to conceal their fraud and to create the appearance of significant injury in order to justify their bills.

113.   The Raychouni clinics used boilerplate forms that were almost entirely cloned for every patient and on every date with only minor variations.

114.   Chiropractors are required to diagnose and document the specific location of "subluxations" (alleged misalignments of the spine) that they purport to treat with CMT.

115.   In order to meet this requirement for patients who had no actual spinal injuries, the Raychouni clinics simply invented subluxations at levels that did not, in fact, exist.

116.   To maximize their charges, the Raychouni clinics nearly always claimed to provide CMT to three (3) or more spinal regions.

117.   To create the appearance of justification for these alleged treatments, the Raychouni clinics nearly always purported to find subluxations in all three (3) major regions of their patients' spines, including the cervical, thoracic, and lumbar regions.

118.   When patients sustain spinal injuries as a result of acute trauma, such as a motor vehicle accident, those injuries are usually limited to one spinal region.

119.   The Raychouni clinics purported to find subluxations from acute injury in three (3) or more spinal regions for nearly all Allstate insureds they billed for treating since 2018, which is simply not possible.

120.   During the period at issue, the Raychouni clinics billed Allstate for spinal CMT more than 3,600 times and just two (2) of those charges were for fewer than three (3) spinal regions.  *See* Exhibits 1 and 2.

121.   In many cases, MRIs and findings by other medical providers directly contradicted the Raychouni clinics' diagnoses.

122.   For example, on March 16, 2021, Michigan Spine diagnosed A.B. (Claim No. 0619061974) with subluxations in her cervical spine (C5), thoracic spine (T3), and lumbar spine (L5).

123.    A.B. was only twenty (20) years old at the time and therefore unlikely to have misalignments in all three (3) main regions of her spine unless she was severely injured.

124.    Just three (3) days prior, on the date of her alleged accident, A.B. was evaluated at Henry Ford Hospital where she had a CT scan performed on her cervical spine that found no misalignments in A.B.'s cervical spine at C5 or anywhere else, and found no evidence of acute injury.

125.    Less than a month after Michigan Spine's diagnosis of multiple subluxations, A.B. had MRIs taken of her cervical and lumbar spine.

126.    Those MRIs, taken on April 7, 2021, both found no spinal misalignments and no evidence of fracture.

127.    Similarly, Downriver diagnosed patient R.D. (Claim No. 0659027494) with subluxations in his cervical spine (C4), thoracic spine (T3), and lumbar spine (L5).

128.    On the same day as his alleged accident, February 9, 2022, R.D. was evaluated in the emergency department of Beaumont Hospital where a CT scan of R.D.'s cervical spine expressly stated that it showed no evidence of subluxations or any other acute injury.

129.    MRIs taken of R.D.'s cervical spine and lumbar spine on March 8, 2022 and April 22, 2022, respectively, also found no subluxations or misalignments.

130.    These alleged subluxations were invented by the defendants to create the false appearance of medical necessity for treatment that A.B., R.D., and other patients at issue herein did not actually need.

131.    The Raychouni clinics also exaggerated the severity of patients' alleged pain complaints to create the appearance of medical necessity for their bills.

132.    For example, L.Z. (Claim No. 0642996135) was allegedly injured on September 24, 2021 and underwent two (2) months of physical therapy during which her reported pain scores improved from seven (7) out of ten (10) to four (4) and five (5) out of ten (10).

133.    L.Z. then presented to Michigan Spine on December 15, 2021 at which time it was claimed her pain was a nine (9) out of ten (10), higher than she had ever reported previously.

134.    Similarly, A.M. (Claim No. 0619770372) was allegedly involved in a motor vehicle accident on March 21, 2021 and sought no treatment at all for almost a month.

135.    When he finally presented to Downriver for treatment on April 19, 2021, Downriver claimed that A.M. had pain in his neck, mid-back, and low back rated as a nine (9) out of ten (10), indicating excruciating and crippling pain.

136.    Downriver provided no explanation of why a patient with supposed crippling pain did not require any prior medical attention.

137.   In reality, these patients had minor injuries or no injuries at all and the Raychouni clinics used falsified and exaggerated records to create the false appearance of medical necessity for the unnecessary treatment that they billed.

## VIII.  <u>FRAUDULENT, UNNECESSARY, AND EXCESSIVE TREATMENT</u>

138.   The defendants' willingness to falsify records and to bill for services that were never rendered, services that were based on falsified records, and services that were unlawful demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

139.   The Raychouni clinics' purported treatment also violated standards of care, because it was unnecessary, redundant, excessive, and repeated without any benefit to patients.

140.   The full extent of the defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

141.   The unnecessary treatment and services billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 3.

142. All of the claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

143. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

144. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

## A. THE RAYCHOUNI CLINICS' PREDETERMINED TREATMENT PROTOCOL AND BOILERPLATE BILLING

145. The Raychouni clinics billed nearly the exact same alleged services to all patients regardless of the patients' ages, comorbidities, or alleged injuries.

146. Initially, the Raychouni Clinics routinely billed the following alleged services:

- mechanical traction;
- therapeutic exercise;
- neuromuscular reeducation (beginning in 2019);
- manual therapy; and
- either CMT to 3-4 spinal regions or CMT to 5 or more regions.

147. The Raychouni clinics also sometimes added charges for application of hot/cold packs, therapeutic massage, electrical stimulation, and extraspinal CMT.

148.   Prior to the introduction of the Michigan No-Fault Act's medical fee schedule, the Raychouni clinics typically billed one (1) unit each of therapeutic exercise and neuromuscular reeducation.

149.   As explained more fully herein, these alleged treatments were fraudulent, unnecessary, and not provided as billed.

150.   When the statutory fee schedule was introduced in 2021, the Raychouni clinics compensated by simply billing for more units of therapy that they did not actually provide.

151.   For example, the clinics' typical charge of $190 for two (2) units of timed therapy became $205 for three (3) units.

152.   Beginning in 2023, the Raychouni clinics also started billing for experimental and unproven alleged treatments, such as purported "shockwave" therapy, for which they charged an absurd $675 for fifteen (15) minutes of alleged treatment or less.

153.   These changes by the Raychouni clinics were made to thwart the Michigan No-Fault fee schedule and to increase the defendants' profits, not out of any patient-specific treatment considerations.

154.   It is impossible that patients with different injuries, ages, histories, genders, and comorbidities all required substantially identical treatment.

155.    The Raychouni clinics never re-evaluated patients to assess whether treatment was efficacious or whether patients had improved to the point that discharge should be considered.

156.    To the extent treatment plans existed at all, they were vague and absurd.

157.    For example, Michigan Spine repeatedly claimed that L.S.'s (Claim No. 0657439832) "projected treatment program shall continue as per treatment plan of 2/17/2022."

158.    February 17, 2022 was L.S.'s first visit at Michigan Spine and its "plan" on that date was merely: "Based on today's objective findings, the patient's treatment plan is updated to: 3x week until 2/28/2023."

159.    As an initial matter, more than a year of planned chiropractic treatment is clearly excessive and inappropriate.

160.    This "plan" also fails to account for clearly relevant issues related to L.S.'s treatment, including that she had previously attempted months of physical therapy for the same alleged injuries and that she was expecting to have surgery to implant hardware in her spine in the near future.

161.    To further illustrate how this treatment "plan" was not patient specific, the exact same language and clearly excessive period of treatment was used relative to L.Z. (Claim No. 0642996135) at her initial visit on December 15, 2021: "Based

on today's objective findings, the patient's treatment plan is updated to: 3x week until 12/16/2022."

162.   A.R.'s (Claim No. 0663685600) treatment "plan" on April 12, 2022 was "Based on today's objective findings, the patient's treatment plan is updated to: prn until 4/12/2023."

163.   Not only did the Raychouni clinics bill for almost exactly the same alleged treatments to every patient, but they also assigned very similar diagnoses to every patient.

164.   The uniformity of alleged treatments and diagnoses across the Raychouni clinics' patients demonstrates that these alleged services were not reasonable and were not based on any legitimate medical need.  Instead, they were billed solely to maximize the charges that the defendants believed they could induce Allstate to pay.

### B.   UNNECESSARY CONCURRENT TREATMENT

165.   Patients of the Raychouni clinics had overlapping, concurrent treatment for the same alleged injuries by physical therapists or other chiropractors.

166.   Concurrent treatment by two different chiropractors or physical therapists for the same injury is never medically necessary.

167.   As one example, Allstate was billed by a separate provider for physical therapy to A.M. (Claim No. 0619770372) in July, August, and September of 2021.

168.   Allstate was also billed by Downriver for allegedly treating A.M.'s same purported injuries in highly similar ways from April 19, 2021 through September 9, 2021.

169.   On at least four (4) dates – August 10, August, 17, August 24, and September 7 of 2021 – the physical therapy provider and Downriver both billed for alleged treatment to A.M. on the same dates.

170.   Downriver never acknowledged or accounted for this redundant treatment.

171.   Likewise, Michigan Spine billed for treatment of patient A.R. (Claim No. 0663685600) from April 12, 2022 through October 21, 2022.

172.   A separate physical therapist billed for an initial evaluation of A.R. on April 1, 2022 and billed for treating him through September 28, 2022.

173.   This represents more than five (5) months of alleged concurrent treatment for the same alleged injuries with no acknowledgment by Michigan Spine of this redundant treatment that should have had a significant impact on any treatment plan.

### C.   EXCESSIVE PURPORTED TREATMENT

174.   Except in cases of extraordinary injury, chiropractic treatment after a motor vehicle accident should not be expected to last for more than three (3) months at the very longest.

175.   The Raychouni clinics, however, frequently billed for excessive alleged treatments over much longer time periods, sometimes exceeding a year.

176.   As detailed above, these lengthy courses of treatment were pre-planned at patients' initial visits where it was reported that the patient was told to return to the clinic regularly for at least a year.

177.   Moreover, the treatments billed by the Raychouni clinics did not materially change over these extensive courses.

178.   It is not possible for chiropractic treatment to be unchanged and remain medically necessary at these lengths of time.

179.   A patient must either (1) improve with treatment, in which case treatment should change and taper to account for the improvement, or (2) fail to improve with treatment, in which case the treatment should be changed (if any additional options remain) or discontinued.

180.   The Raychouni clinics never performed the patient re-evaluations that might have been used to alter treatment, even during exceptionally long periods of alleged treatment.

181.   Indeed, the Raychouni clinics billed for excessive and repetitive therapies even in the face of clear evidence that patients were not benefiting from the purported treatment.

182.   For example, Downriver billed Allstate for purportedly treating R.S. (Claim No. 0641222070) on an incredible 181 dates over fifteen (15) months.

183.   On the date of her alleged injury, R.S. reported her pain as only two (2) out of ten (10) and x-rays found that she had no acute injury.

184.   At the start of her treatment at Downriver, R.S.'s alleged pain was a nine (9) out of ten (10).  Fifteen (15) months and nearly 200 dates of treatment later, her alleged pain had fallen only two (2) points to seven (7) out of ten (10).

185.   Despite no significant improvement to her pain complaints, R.S.'s course of treatment billed by Downriver was never materially changed.

186.   As another example, Michigan Spine billed Allstate for 60 dates of alleged treatment to L.S. (Claim No. 0657439832) over the course of five (5) months.

187.   L.S.'s alleged pain scores also improved only two (2) points from nine (9) out of ten (10) on her first date of service to a seven (7) out of ten (10) on her last date of service.

188.   Long courses of treatment that have little or no effect on patients' pain are not medically necessary.

189.   If patients do not show significant improvement after several months of treatment, chiropractic care should cease and alternate types of treatment should be attempted.

190.   Because the Raychouni clinics billed to maximize charges to insurers like Allstate, treatment was not discontinued even in the face of clear evidence that it was not working and was not necessary, if it was provided at all.

D.   **EXCESSIVE AND UNNECESSARY SHOCKWAVE TREATMENT**

191.   The Raychouni clinics billed for allegedly subjecting patients to experimental extracorporeal shock wave therapy ("ESWT") that was unnecessary, unhelpful, and excessive.

192.   ESWT involves the application of high-energy acoustic waves to a patient's skin to supposedly break down tissue.

193.   Unlike many other treatment modalities, including typical over-the-counter medications, application of cold packs, and other routine treatments, ESWT is intended to be pro-inflammatory rather than anti-inflammatory and therefore is contraindicated when patients were undergoing anti-inflammatory treatments or using anti-inflammatory medications such as ibuprofen.

194.   The defendants did not instruct their patients to refrain from anti-inflammatory treatments and in fact often billed for treatments that had anti-inflammatory effects contemporaneously with shockwave therapy, which rendered the treatments pointless.

195.   For example, from June 19, 2023 through August 25, 2023, Michigan Spine billed for both ESWT and manual therapy (which seeks to reduce

inflammation), including often billing for both modalities for the same patient on the same dates.

196.   The mechanism of ESWT treatment is a machine that uses compressed air to accelerate a projectile up to 80 to 90 kph within a guiding tube that strikes a metal applicator placed on the patient's skin.

197.   ESWT first emerged in the 1980s as a noninvasive treatment known as lithotripsy used exclusively to eliminate kidney stones.

198.   The application of ESWT is only approved by the United States Food and Drug Administration ("FDA") for two specific types of musculoskeletal injury: (1) lateral epicondylitis (commonly known as tennis elbow) and (2) chronic plantar fasciitis, neither of which are acute injuries that may be sustained in a motor vehicle accident.

199.   The Raychouni clinics never billed for ESWT as a treatment for either of these FDA-approved conditions.

200.   Instead, the Raychouni clinics billed for using ESWT as an unproven treatment for alleged back and neck pain.

201.   The federal government has deemed ESWT to be medically unnecessary as a purported treatment for back and neck pain, and has stated that ESWT is "not reasonable and necessary for the treatment of musculoskeletal conditions," because "[t]he available evidence suggests that further research is

needed to establish the efficacy and safety of high energy ESWT in the treatment of musculoskeletal conditions."

202. Not only was the Raychouni clinics' application of ESWT always medically unnecessary, it was also billed excessively.

203. Providers who offer ESWT, whether for its FDA-approved uses or for off-label treatment, typically subject patients to only a handful of sessions.

204. Sessions are also spaced out to give patients' muscles time to recover and most providers recommend spacing out sessions by one (1) or two (2) weeks.

205. In contrast, the Raychouni clinics routinely billed Allstate for alleged ESWT on every date of service for a given patient, including consecutive days and often for courses that far exceeded ten (10) sessions.

206. For example, Michigan Spine billed Allstate for thirty-six (36) sessions of alleged ESWT to patient J.W. (Claim No. 0717308456) at a total cost of $24,300 that included alleged treatment three (3) days in a row on August 7, 8, and 9 of 2023.

207. As additional examples, Michigan Spine billed Allstate for twenty-seven (27) sessions of alleged ESWT to H.H. (Claim No. 0700740624), twenty-seven (27) sessions of alleged ESWT to J.T. (Claim No. 0700051535), and twenty-eight (28) sessions of alleged ESWT to T.H. (Claim No. 0717208086), all of which were extraordinarily excessive.

208.   H.H. was allegedly subjected to ESWT three (3) days in a row on August 16, 17, and 18 of 2023.

209.   The defendants billed for repeated applications of ESWT even when acknowledging that patients realized no benefit from the alleged treatments.

210.   For example, during the course of J.W.'s (Claim No. 0717308456) thirty-six (36) sessions of alleged ESWT, his alleged pain scores in his back and neck barely changed from eight (8) out of ten (10) in all three main spinal regions (where the ESWT was allegedly applied), to seven (7) out of ten (10) in his cervical and lumbar spine, and six (6) out of ten (10) in his thoracic spine.

### E.   COLD LASER THERAPY

211.   The Raychouni clinics also billed Allstate for alleged "cold laser therapy."

212.   This purported treatment is also known as low-level or low-power laser therapy (LLLT or LPLT) and uses red or infrared light to stimulate cells.

213.   Cold laser therapy is another unproven and medically unnecessary treatment that the Raychouni clinics have adopted in order to thwart the Michigan No-Fault medical fee schedule by billing for treatment that is not on that fee schedule.

214.   Cold laser devices have not been approved to treat any musculoskeletal conditions and there is scant medical evidence that they provide any relief beyond a placebo effect.

215.   The Raychouni clinics fraudulently billed this purported treatment using Current Procedural Terminology ("CPT")[3] code 97039, which describes an "unlisted modality."

216.   The proper code to use when billing for cold laser therapy (if any billing is proper at all) is either CPT code 0552T (from July 1, 2019 – December 31, 2023) or CPT code 97037 (effective January 1, 2024).

217.   The Raychouni clinics fraudulently billed for an "unlisted modality" to conceal the fact that they were billing for a listed modality that is not medically necessary.

218.   Like other modalities billed by the Raychouni clinics, purported cold laser therapy was repeated without any apparent impact on patients' conditions or reports of pain.

219.   These treatments were included in treatment plans as a matter of course in order to generate bills and not because they were medically necessary or

---

[3] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers who are subject to the Health Insurance Portability and Accountability Act ("HIPAA") are required to use CPT codes.

appropriate, and Allstate is not required to remit payment for these non-compensable alleged treatments.

### F.    MEDICALLY UNNECESSARY TRANSPORTATION SERVICES

220.    The Raychouni clinics used improper inducements to persuade people who were involved in alleged motor vehicle accidents to treat with them even if they were uninjured and no treatment was necessary.

221.    One of the typical inducements offered by the Raychouni clinics was unnecessary transportation services to the clinic, often billed by defendant First Mutual.

222.    To create the appearance that bills submitted by First Mutual were necessary (i.e., that the patient actually required transportation services due to injury), the Raychouni clinics provided disability forms to patients who used this service.

223.    First Mutual used the Raychouni clinics' disability certificates to bill exorbitant charges for unnecessary transportation.

224.    Some patients such as A.M. (Claim No. 0619770372) and L.S. (Claim No. 0657439832) were allegedly transported by First Mutual on their first date of service, before they were evaluated by the Raychouni clinics, which illustrates the findings of supposed disability were predetermined and *pro forma*.

225.   Other patients, such as J.T. (Claim No. 0700051535), clearly did not require medical transportation services based on their clinical presentations and diagnostic study findings.

226.   First Mutual billed for routine alleged transportation of J.T. for nearly half a year from December 6, 2022 to May 26, 2023.

227.   Prior to First Mutual beginning billing relative to J.T., the patient had five (5) MRIs of his entire spine and bilateral wrists on December 8, 2022, and they revealed no fractures or acute trauma.

228.   J.T. never sought any interventional treatment for his alleged back pain, which would be expected if a patient was so debilitated that they could not transport their self for nearly six (6) months.

229.   In reality, if J.T. had any persistent injuries at all, they did not actually prevent him from driving and First Mutual's bills for such services were unnecessary.

## IX.   **FRAUDULENT BILLING**

230.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed.

231.   The defendants failed to meet this responsibility and instead submitted bills to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

232.   All of the medical records, bills, and invoices submitted to Allstate by the defendants contained CPT codes.

233.   By utilizing CPT codes to submit billing to Allstate, the defendants represented that the services they billed for corresponded to and were accurately described by the descriptions for the CPT codes they utilized.

234.   The defendants never communicated to Allstate that they intended that the CPT codes they used to submit bills have any meanings other than those ascribed by the AMA, which publishes CPT codes.

235.   Allstate reasonably relied on the representations and published definitions assigned to the CPT codes billed by the defendants.

236.   Allstate reasonably relied on the defendants' utilization of CPT codes to accurately report the services they rendered to Allstate insureds.

237.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

238.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

239.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through the U.S. Mail and interstate wires.

240.   The defendants routinely billed for CMT and manual therapy to nearly every patient and on every date of service.  *See* Exhibits 1 and 2.

241.   These therapies describe similar treatments consisting of hands-on manipulation of a patient's joints, muscles, and soft tissue to produce a therapeutic effect.

242.   It is inappropriate, and fraudulent double billing, to bill for both of these codes if provided to the same patient on the same day and to the same region of the body. The code for CMT already includes any necessary manual therapy to the same region.

243.   In an attempt to get around billing rules, the Raychouni clinics claimed to perform manual therapy to regions such as the piriformis muscles (buttocks), suboccipital muscles (back of the head where the spine meets the skull), or shoulders to create the appearance that these therapies were not performed on the spine.

244.   But in many of these cases, the alleged manual therapy did overlap with CMT that the Raychouni clinics billed such as CMT to the illium or sacrum (in the buttocks region), the cervical spine (in the suboccipital region), and extraspinal CMT to the shoulder.

245.   Thus, the Raychouni clinics' charges for manual therapy were fraudulently double billed because that alleged treatment necessarily overlapped with CMT billed on the same day.

246.   The defendants routinely used CPT code modifier 59 ("Distinct procedural service") to conceal their double billing.

247.   This modifier is used to report that charges that are ordinarily not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

248.   Appending modifier 59 to CPT codes indiscriminately is a deceptive practice intended to bypass automated claim adjudication systems that would otherwise detect fraudulent double billing.

249.   Indeed, in 2014, the federal government released a publication warning providers that CPT code modifier 59 was being overused and was associated with cases of fraud and abuse of the system.

250.   Allstate is not obligated to pay any pending bills for improperly coded treatments and is entitled to restitution for those alleged treatments for which it has already paid due to the misrepresentations by the defendants.

## X.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

251.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

252.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

253.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

254.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

255.    There are no less than ten (10) separate reasons why the defendants'
alleged treatment was not in fact performed, was not lawful, was not medically
necessary, and was fraudulently billed to Allstate:

    a.  The defendants routinely billed for services that were not performed at all;

    b.  The Raychouni clinics billed for services that they failed to document, including for timed services supported by false and fraudulent assertions of the amount of time spent;

    c.  The Raychouni clinics improperly induced patients to have medically unnecessary treatment;

    d.  The Raychouni clinics' alleged treatments were based on false and fabricated diagnoses of injuries that did not exist;

    e.  The Raychouni clinics' provision of DME was unlicensed and unlawful;

    f.  The Raychouni clinics' alleged treatments were excessive and not medically necessary;

    g.  The Raychouni clinics' alleged treatments were based on a predetermined treatment protocol that had no relation to patients' alleged injuries, if any, and were selected solely to maximize charges;

    h.  First Mutual billed for transportation of patients that was medically unnecessary and based on fraudulent disability certificates;

    i.  The Raychouni clinics submitted bills using multiple CPT codes to describe the same treatments allegedly performed, which constitutes fraudulent double billing; and

    j.  The Raychouni clinics improperly used and abused CPT code modifier 59 to describe services allegedly performed in order to increase the amount of bills submitted to Allstate.

256. As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

257. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

258. The foregoing facts – including billing for services not rendered, falsifying medical records, and misrepresenting the necessity of treatment – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

259. The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the alleged treatment by the defendants unnecessary and unlawful.

260. The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 3.

261. Thus, each claim for payment (and accompanying submissions) under Michigan's No-Fault Act mailed or faxed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

262.    Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

263.    Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail and interstate wires, the defendants attested to the fact, lawfulness, and medical necessity of the services for which they billed Allstate.

264.    As the defendants did not render lawful and reasonably necessary treatment, and misrepresented the treatment purportedly performed, each bill and accompanying documentation mailed or faxed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

**B.    ALLSTATE'S JUSTIFIABLE RELIANCE**

265.    The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

266.    At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

267. These misrepresentations include submitting false medical documentation, including HICFs, falsely representing to Allstate the fact, lawfulness, and necessity of medical treatment and services in order to seek payment under Michigan's No-Fault Act.

268. As a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

269. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the services billed.

270. As a result, Allstate has incurred costs in adjusting and investigating the insurance claims submitted by the defendants and paid money to the defendants as a result of the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XI.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

271. As discussed above, the services billed by the defendants were not medically necessary, were unlawful, were fraudulently billed, and frequently were not provided at all.

272. The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibits 1 through 3, was to collect No-Fault benefits

to which the defendants were not entitled because the services provided, if at all, were not necessary, were not lawfully rendered, and were fraudulently billed.

273. This objective necessarily required the submission of bills for payment to Allstate.

274. The defendants created, prepared, and submitted to Allstate false medical documentation and placed in a post office and/or other authorized depository for mail and things to be sent and delivered by the United States Postal Service or sent faxes over interstate wires.

275. Documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with all insurance claims referenced throughout this pleading traveled through faxes over interstate wires or the U.S. Mail.

276. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Illinois and Ohio.

277. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

278. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false submissions and bills was tendered via a check mailed by Allstate using the U.S. Mail.

279. The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

280. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 4.

281. As detailed herein, the defendants also submitted, caused to be submitted, or knew claims for payment would be submitted to Allstate via mail or interstate wire related to each exemplar patient discussed in this Complaint.

282. It was within the ordinary course of business for the defendants to submit claims for No-Fault payment to insurance carriers like Allstate through the U.S. Mail and interstate wires.

283. Moreover, the business of billing for medical services and transportation by the defendants is regularly conducted by fraudulently seeking payment to which they are not entitled through the use of fraudulent communications sent via the U.S. Mail and interstate wires.

284. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for the defendants.

285.   The defendants continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

286.   Thus, the defendants' commission of mail and wire fraud continues.

287.   As all of the defendants named herein used the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, the defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

288.   As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable and lawful, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343

289.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 through 4 annexed hereto and identified in the exemplar claims above.

## XII.   **DAMAGES**

290.   The fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

291.   For the reasons set forth in this Complaint, Allstate seeks compensatory damages against the defendants for the amounts Allstate has paid to them and paid because of them and their conduct, which totals hundreds of thousands of dollars.

292.   Every payment claimed by Allstate as damages was made by Allstate alone.

293.   Moreover, every payment made by Allstate derives from a check sent by Allstate to the defendants through the U.S. Mail.

294.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

295.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

296.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIII.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan Spine Enterprise)
### Against First Mutual Transportation LLC and Mohamed Raychouni, D.C.

297.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

298.   Michigan Spine constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

299.   In connection with each of the claims identified in the within Complaint, defendants First Mutual and Mohamed Raychouni ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Michigan Spine, or knew that such false medical documentation would be mailed in the ordinary course of Michigan Spine's business, or should have reasonably foreseen that the mailing of such false medical documentation by Michigan Spine would occur, in furtherance of the Count I defendants' scheme to defraud.

300.   The Count I defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 4.

301.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by Michigan Spine, which they knew would be billed by Michigan Spine, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

302.    Mohamed Raychouni owned, managed, and controlled Michigan Spine and was responsible for all actions taken by Michigan Spine and its staff.

303.    First Mutual transported patients to Michigan Spine, based on fraudulent disability certificates supplied by Michigan Spine, in order to permit Michigan Spine to generate bills for excessive and unnecessary alleged services.

304.    The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Michigan Spine to continue billing for unlawful and medically unnecessary alleged treatment.

305.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Michigan Spine for the benefit of the Count I defendants that would not otherwise have been paid.

306.    The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

307.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Michigan Spine Enterprise)**
**Against First Mutual Transportation LLC and Mohamed Raychouni, D.C.**

308.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

309.   Defendants First Mutual and Mohamed Raychouni ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Michigan Spine.

310.   The Count II defendants each agreed to further, facilitate, support, and operate the Michigan Spine enterprise.

311.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

312.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Michigan Spine even though Michigan Spine was not eligible to collect such payments by virtue of its unlawful conduct.

313.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives between themselves including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

314.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

315.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Downriver Enterprise)
### Against First Mutual Transportation LLC, Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

316.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

317.   Downriver constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

318. In connection with each of the claims identified in the within Complaint, defendants First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by Downriver, or knew that such false medical documentation would be mailed in the ordinary course of Downriver's business, or should have reasonably foreseen that the mailing of such false medical documentation by Downriver would occur, in furtherance of the Count III defendants' scheme to defraud.

319. The Count III defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings identified in the chart annexed hereto at Exhibit 4.

320. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Downriver, which they knew would be billed by Downriver, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

321. Mohamed Raychouni and Mustafa Raychouni owned, managed, and controlled Downriver and were responsible for all actions taken by Downriver and its staff.

322.   First Mutual transported patients to Downriver, based on fraudulent disability certificates supplied by Downriver, in order to permit Downriver to generate bills for excessive and unnecessary alleged services.

323.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Downriver to continue billing for unlawful and medically unnecessary alleged treatment.

324.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Downriver for the benefit of the Count III defendants that would not otherwise have been paid.

325.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

326.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT IV**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Downriver Enterprise)**
**Against First Mutual Transportation LLC, Mohamed Raychouni, D.C., and**
**Mustafa Raychouni, D.C.**

327.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

328.  Defendants First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Downriver.

329.  The Count IV defendants each agreed to further, facilitate, support, and operate the Downriver enterprise.

330.  As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

331.  The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Downriver even though Downriver was not eligible to collect such payments by virtue of its unlawful conduct.

332.  The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

333.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

334.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(First Mutual Enterprise)**
**Against Michigan Spine Management Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.**

335.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

336.   First Mutual constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

337.   In connection with each of the claims identified in the within Complaint, defendants Michigan Spine, Downriver, Mohamed Raychouni, and Mustafa Raychouni ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by First Mutual, or knew that such false medical documentation would be faxed and mailed in the ordinary course of

58

First Mutual's business, or should have reasonably foreseen that the faxing and mailing of such false medical documentation by First Mutual would occur, in furtherance of the Count V defendants' scheme to defraud.

338. The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including those mailings and faxes identified in the chart annexed hereto at Exhibit 4.

339. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical transportation services that were purportedly performed by First Mutual, which they knew would be billed by First Mutual, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

340. Michigan Spine and Downriver, and their owners Mohamed Raychouni and Mustafa Raychouni, supplied patients with fraudulent disability certificates so that First Mutual could use them as a basis for fraudulent transportation fees.

341. The Count V defendants submitted, and caused to be submitted, false and fraudulent medical transportation records, bills, and invoices that created the appearance of injury and permitted First Mutual to continue billing for unlawful and medically unnecessary alleged transportation.

342.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to First Mutual for the benefit of the Count V defendants that would not otherwise have been paid.

343.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

344.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (First Mutual Enterprise)
### Against Michigan Spine Management Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

345.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

346.   Defendants Michigan Spine, Downriver, Mohamed Raychouni, and Mustafa Raychouni ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of First Mutual.

347.   The Count VI defendants each agreed to further, facilitate, support, and operate the First Mutual enterprise.

348.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

349.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of First Mutual even though First Mutual was not eligible to collect such payments by virtue of its unlawful conduct.

350.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

351.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

352.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## COMMON LAW FRAUD
### Against All Defendants

353.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

354.   The scheme to defraud perpetrated by Michigan Spine, Downriver, First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count VII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

355.   The misrepresentations of fact made by the Count VII defendants include those material misrepresentations discussed in section X.A, *supra*.

356.   The Count VII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

357.   The misrepresentations were intentionally made by the Count VII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

358.   The Count VII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

359.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

360.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT VIII**
**CIVIL CONSPIRACY**
**Against All Defendants**

361.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

362.   Defendants Michigan Spine, Downriver, First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count VIII defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

363. The Count VIII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

364. This purpose was known to all of the Count VIII defendants and intentionally pursued.

365. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count VIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

366. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

367. All of the Count VIII defendants directly benefited from the payments made to Michigan Spine, Downriver, and First Mutual.

368. All of the Count VIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count VIII defendants in the commission of acts done for the benefit of all Count VIII defendants and to the unjustified detriment of Allstate.

369. Accordingly, all of the Count VIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

**COUNT IX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Michigan Spine Management Clinic PLC, Downriver Spine**
**Management Clinic, P.L.L.C., and First Mutual Transportation LLC.**

370. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

371. Allstate paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by defendants Michigan Spine, Downriver, and First Mutual ("Count IX defendants").

372. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count IX defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical/transportation services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

373. The Count IX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

374.   Allstate is entitled to restitution from each of the Count IX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

375.   The Count IX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT X**
**UNJUST ENRICHMENT**
**Against All Defendants**

376.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

377.   Defendants Michigan Spine, Downriver, First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count X defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon and as a result of the defendants' fraudulent misrepresentations.

378.   Allstate's payments constitute a benefit which the Count X defendants aggressively sought and voluntarily accepted.

379.   The Count X defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

380.   The Count X defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

381.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 296 set forth above as if fully set forth herein.

382.   Defendants Michigan Spine, Downriver, First Mutual, Mohamed Raychouni, and Mustafa Raychouni ("Count XI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

383.   The Count XI defendants also billed for services not rendered.

384.   The Count XI defendants also billed for services pursuant to a scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services or transportation services.

385.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

386.    The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

387.    The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.  Mich. Comp. Laws § 500.3157(1).

388.    Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

389.    The Count XI defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical and transportation services to Allstate, and other claims remain pending with Allstate.

390.    The Count XI defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XI defendants for any or all of the reasons set out in the within Complaint.

391.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

392.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

393.   As such, the Count XI defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, et seq., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

394.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

## XIV.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Michigan Spine Enterprise)**
**Against First Mutual Transportation LLC and Mohamed Raychouni, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Michigan Spine Enterprise)**
**Against First Mutual Transportation LLC and Mohamed Raychouni, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Downriver Enterprise)
### Against First Mutual Transportation LLC, Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Downriver Enterprise)
### Against First Mutual Transportation LLC, Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (First Mutual Enterprise)
### Against Michigan Spine Management Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (First Mutual Enterprise)
### Against Michigan Spine Management Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT VII
**COMMON LAW FRAUD**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

### COUNT VIII
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

**COUNT IX**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Michigan Spine Management Clinic PLC, Downriver Spine**
**Management Clinic, P.L.L.C., and First Mutual Transportation LLC.**

(a)    AWARD Allstate its actual and consequential damages in an amount
to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

**COUNT X**
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages in an amount
to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

**COUNT XI**
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)    DECLARE that Allstate has no obligation to pay pending and
previously-denied insurance claims submitted by Michigan Spine Management
Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., First Mutual
Transportation LLC, Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C.,
jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that Michigan Spine Management Clinic PLC, Downriver
Spine Management Clinic, P.L.L.C., First Mutual Transportation LLC, Mohamed
Raychouni, D.C., and Mustafa Raychouni, D.C., jointly and severally, cannot seek

payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)     DECLARE that Michigan Spine Management Clinic PLC, Downriver Spine Management Clinic, P.L.L.C., First Mutual Transportation LLC, Mohamed Raychouni, D.C., and Mustafa Raychouni, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XV.  **JURY DEMAND**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____

Andrew H. DeNinno (P87678)
adeninno@ktmpc.com
William G. Potter
wpotter@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated: October 23, 2024              *Attorneys for Plaintiffs*